**UNITED STATES of America,**
**Plaintiff,**

**v.**

**NATIONAL STEEL CORPORATION,**
**Stran-Steel Corporation, Metallic Build-**
**ing Company, Brinkley B. Brown,**
**Charles R. McDaniel, and Gilbert Leach,**
**Defendants.**

**Civ. A. No. 13032.**

United States District Court
S. D. Texas,
Houston Division.

Feb. 3, 1965.

Woodrow Seals, U. S. Atty., and John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., and Allen A. Dobey, John C. Fricano and Karl M. Kunz, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Baker, Botts, Shepherd & Coates, Denman Moody, C. Brien Dillon, E. W. Barnett and R. Gordon Gooch, Houston, Tex., and Thorp, Reed & Armstrong, William C. O'Neil, Pittsburgh, Pa., for corporate defendants.

Fulbright, Crooker, Freeman, Bates & Jaworski, B. J. Bradshaw, Houston, Tex., for individual defendants.

INGRAHAM, District Judge.

This suit was brought by the United States of America under 15 U.S.C.A. §§ 18 and 25 (Sec. 7 and 15, Clayton Act), against National Steel Corporation ("National"), Stran-Steel Corporation ("Stran"), Metallic Building Company ("Metallic") and the three individuals named in the caption, Brown, McDaniel and Leach, to set aside and enjoin the acquisition of the common stock of "Metallic" by "Stran". Trial thereof was had on February 24, 25, 26, 27 and 28 and March 3, 4 and 5, 1964. Evidence was adduced by various means, depositions, interrogatories, admissions, stipulations, oral, documentary, etc. When plaintiff rested its case, the defendants moved for dismissal in accordance with the provisions of Rule 41(b) of the Federal Rules of Civil Procedure, on the grounds that upon the facts and the law plaintiff had shown no right to relief, that plaintiff had not proved its case by a preponderance of the evidence and that the defendants were therefore entitled to final judgment on the merits.

From the record before me, I am not impressed, I am not moved, that the so-called merger of Metallic with Stran would substantially lessen competition.

I am unable to determine from the record just what is meant by a "prefabricated metal building". Each word, considered singly, has a well defined meaning. But from the record before me, "prefabricated metal buildings" come in all sizes and shapes. They are built with masonry—and without masonry. They are built with wood—and without wood. They are "custom-built". They are built to the specification of the customer.

Briefs were submitted by the parties and oral arguments were heard on the motion on December 3, 1964, and the matter was submitted for decision. Having considered the evidence, arguments and briefs, and being fully advised in the premises, it is my opinion that defendants' motion is well taken and should be granted.

The following are filed as Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT
### The Parties And The Acquisition

1. National is a Delaware corporation. Stran is a Michigan corporation, and is a subsidiary of National. Metallic is a Texas Corporation.

RECORD REFERENCES: Pretrial Order entered February 28, 1963.

2. Prior to January 30, 1959, Metallic was owned by Brown, McDaniel and Leach, all residents of Houston, Texas. By an agreement dated December 12, 1958, they agreed to sell to National 75% of Metallic's stock and gave National an option to purchase the remaining 25%. National designated Stran its nominee to perform its obligations under that agreement, and on January 30, 1959, Stran acquired 75% of Metallic's stock, the remaining 25% then being held by McDaniel and Leach. Pursuant to an agreement dated March 19, 1962, between National, Leach and McDaniel, the rights under the option became fixed, and Metallic became in effect a wholly owned subsidiary. At the trial and for all purposes of these findings, conclusions and judgment, the acquisition has been treated as a 100% stock acquisition.

RECORD REFERENCES: Pretrial order entered February 28, 1963; Amended Answer of Defendants Charles R. McDaniel and Gilbert Leach.

3. On February 15, 1960, plaintiff filed suit alleging that the acquisition by Stran of the Metallic stock violated Section 7 of the Clayton Act in that the effect of the acquisition may be substantially to lessen competition or tend to create a monopoly in the "production and sale of prefabricated metal buildings and component parts thereof" in the United States and various sections thereof. (Hereafter the term "prefabricated metal buildings" shall be deemed to include component parts thereof.)

### Line of Commerce

4. The government has failed to prove that the "production and sale of prefabricated metal buildings" constitutes a line of commerce. In fact the "production and sale of prefabricated metal buildings" does not constitute a line of commerce.

RECORD REFERENCES: Appendix A, pp. 41–244, 251–259; Appendix B, pp. 15–204.

5. Plaintiff's efforts to define "prefabricated metal buildings" were so inconsistent and contradictory as to be meaningless, and no meaningful definition for such term was ever developed or related to market facts. The government's own deposition witnesses gave confusing and conflicting definitions of the term, which definitions conflicted with the term as defined in the Complaint and with the testimony of the government's economic expert. Accordingly, no line of commerce (product market) was ever defined with sufficient clarity to be useable for the purpose of measuring the effect, if any, of the acquisition in question.

RECORD REFERENCES: Compare following examples of plaintiff's efforts to define "prefabricated metal buildings": Plaintiff's Answer to Corporate Defendants' Interrogatory No. 4 (D-6); G-104; Pretrial Tr. 88–89;

Complaint Paragraph 10; Tr. 1023; Tr. 1101–1104; Tr. 1243; Tr. 1041–1045; many other examples were brought out in cross-examination of government witness Mitchell, Tr. 920–1129. Appendix A, pp. 41–94, 115–119; Appendix B, pp. 15–43, 69–88.

6. As indicated above the government failed to establish any meaningful definition or description of the business of Stran and Metallic. In fact, the business of both Stran and Metallic has been, ever since those companies began, in a continuous and rapid state of evolution, and their business is not readily susceptible to being defined as a line of commerce. Buildings into which steel and other products fabricated by Stran and Metallic go today bear no resemblance to the quonset hut or other buildings into which their products went only a few years ago. The tin shed has been the victim of evolution. Materials fabricated by Stran and Metallic today go into buildings which are indistinguishable from buildings made of practically every kind of building material and constructed by practically every kind of building construction company.

RECORD REFERENCES: Tr. 959–960; G-473 (Fears deposition) pp. 64–65; G-483 (Larkin deposition) D-17; G-95. Appendix A, pp. 187–244; Appendix B, pp. 163–183, 223–228.

7. Materials fabricated by Stran and Metallic today are entirely different from those fabricated only a few years ago. Their businesses have been marked by rapid technological advance, new concepts, and constant change. And their activities in the five years since 1959 have been and still are in such a fluid state that they are completely dissimilar today from what they were in 1959. The so-called "production and sale of prefabricated mental buildings" is not a relevant product market for purposes of Section 7 of the Clayton Act and is not a meaningful description of what Stran and Metallic do today or of what they did in 1959.

RECORD REFERENCES: Complaint, Paragraph 13; G-473 (Fears deposition) pp. 64–65; G-483 (Larkin deposition) D-14. Appendix B, pp. 223–228.

8. The term "prefabricated metal building" refers to an ill-defined conceptual label used primarily as an advertising slogan or technique, but does not relate to a well-defined or economically significant product market or submarket within the meaning of Section 7 of the Clayton Act.

RECORD REFERENCES: G-483 (Larkin deposition) D-17; G-472 (Ellis deposition) pp. 60–61; Appendix B, pp. 15–43, 95–106.

9. The term "prefabricated metal building" has been used as an advertising slogan or technique by many companies in the general building business, but these companies have engaged in such a broad range of activities and produce such heterogeneous products, that they do not constitute a meaningful market or submarket on any basis.

RECORD REFERENCES: Appendix A, pp. 125–137; Appendix B, pp. 95–106.

10. The government failed to prove that there is any recognized, or well-defined, or economically significant "industry" known as the "prefabricated metal building industry". In fact, there is no such recognized, or well-defined, or economically significant "industry" for purposes of Section 7 of the Clayton Act.

RECORD REFERENCES: Appendix A, pp. 41–119, 125–137, 187–244; 251–259; Appendix B, pp. 15–88, 95–106, 163–204, 223–228.

11. The government failed to establish whether the companies party to this suit, or other companies, make buildings or make component parts, and failed to establish any meaningful definition of either for purposes of Section 7 of the Clayton Act.

RECORD REFERENCES: G-476 Gilmore deposition) pp. 113–114; G-483 (Larkin deposition) pp. 262–263. Appendix A, pp. 115–119; Appendix B, pp. 69–88.

12. In the general building business, whether viewed from the standpoint of buildings or component parts, there is intense competition among many different building materials including steel, concrete (tilt-up and precast), brick, wood, glass, plastic, aluminum, and many other products. Whether viewed as buildings or component parts, there is a high degree of interchangeability and substitution.

RECORD REFERENCES: G-469 (D'Amico deposition) pp. 52–54; G-490 (Rupp deposition) pp. 87–89, 94 and D-2. Appendix A, pp. 187–244; Appendix B, pp. 163–183.

13. There is intense competition and a high degree of interchangeability among all buildings, no matter how characterized, which serve the same end uses.

RECORD REFERENCES: G-486 Lunsford deposition) pp. 37–39; G-488 (Pascoe deposition) pp. 33, 41–43. Appendix A, pp. 187–244; Appendix B, pp. 163–183.

14. "Metal buildings" can be and are made by all types of steel fabricators, no matter how denominated; and steel fabricators of all kinds in fact can and do make "metal buildings" that are substantially identical to those made by companies alleged by the government to be manufacturers of "prefabricated metal buildings".

RECORD REFERENCES: G-483 (Larkin deposition) G-2; G-484 (Le Gardeur deposition) p. 20. Appendix A, pp. 95–113; Appendix B, pp. 45–68.

15. The government failed to prove that so-called "prefabricated metal buildings" have any peculiar characteristics and uses. In fact, so-called "prefabricated metal buildings" have no peculiar characteristics and uses.

RECORD REFERENCES: G-486 (Lunsford deposition) pp. 50–54; G-472 (Ellis deposition) pp. 71–73. Appendix A, pp. 139–152; Appendix B, pp. 107–123.

16. The government failed to prove that so-called "prefabricated metal buildings" have peculiar characteristics. Ex-

actly the same alleged peculiar characteristics are in fact common to large segments of the general building business and to buildings of many different kinds of construction.

RECORD REFERENCES: G-490 (Rupp deposition) D-1 and pp. 88–90; G-486 (Lunsford deposition) pp. 50–54. Appendix A, pp. 139–152; Appendix B, pp. 107–123.

17. The government failed to prove that so-called "prefabricated metal buildings" have peculiar end uses; alleged peculiar uses are in fact common to large segments of the general building business and to buildings of many kinds of construction. Buildings of practically all kinds of construction serve identical end uses.

RECORD REFERENCES: G-459 (Abbott deposition) pp. 37–38; G-474 Fortier deposition) pp. 35–39. Appendix A, pp. 139–152, 251–259; Appendix B, pp. 107–123, 185–204.

18. The government failed to prove that manufacturers of so-called "pre-fabricated metal buildings" have unique production facilities or unique methods of production; in fact, companies alleged to be manufacturers of so-called "prefabricated metal buildings" have production facilities and methods of production common to those used by large numbers of companies alleged by the government to be other than manufacturers of "prefabricated metal buildings", and including both companies which work with metal and companies which work with materials other than metal.

RECORD REFERENCES: Appendix A, pp. 139–152; Appendix B, pp. 107–123.

19. The government failed to prove that manufacturers of so-called "prefabricated metal buildings" employ special methods of sale or sell to special classes of customers. In fact, manufacturers of so-called "prefabricated metal buildings" do not employ special methods of sale and do not sell to special classes of customers.

RECORD REFERENCES: Evidence proved sales to a variety of ultimate users, e. g., G-173, G-223, G-239, G-258, G-442; sometimes through general contractors, e. g., G-161, G-238, G-312, G-379, G-449; and sometimes through dealers, see Complaint, Paragraph 16. Appendix A, pp. 153–165; Appendix B, pp. 125–143.

20. The government failed to prove that alleged peculiar characteristics such as speed of erection, movability and expandability are peculiar to so-called "prefabricated metal buildings". In fact, such alleged characteristics are common to numerous forms of building construction, and are primarily advertising slogans. Practically every company that builds buildings advertises the same characteristics for itself.

RECORD REFERENCES: G-492 (Shoemaker deposition) D-1 (concrete), D-3 (brick); G-481 (Jones deposition) D-4 and D-5 (wood); G-485 List deposition) D-1 (vinyl); G-483 (Larkin deposition) D-12 (masonite). Appendix A, pp. 139–152; Appendix B, pp. 107–123.

21. The government failed to prove that so-called "prefabricated metal buildings" cost more or less than any other kind of building serving the same end use. In fact, the cost of any building depends upon a number of factors which can be generally summed up as the requirements of the customer.

RECORD REFERENCES: G-473 (Fears deposition) p. 69; G-486 (Lunsford deposition) pp. 46–47; G-459 (Abbott deposition) pp. 47–48. Appendix A, pp. 179–186; Appendix B, pp. 153–162.

22. Plaintiff failed to prove that the so-called "production and sale of prefabricated metal buildings" is a well-defined or economically significant submarket. In fact, the so-called "production and sale of prefabricated metal buildings" is not a well-defined or economically significant submarket and does not constitute a relevant product market or submarket for the purpose of measuring the effect, if any, upon competition of the acquisition in question under Section 7 of the Clayton Act.

RECORD REFERENCES: Appendix A, pp. 41–244, 251–259; Appendix B, pp. 15–204, 223–228.

### Section Of The Country
### (Geographic Market)

23. In order to determine whether there is a reasonable probability that an acquisition will have a substantial effect on competition, it is necessary to determine a line of commerce with which to measure the effect of the acquisition. It is then necessary to determine the geographic area within which this line of commerce is produced, sold, bought and used. As indicated in the prior findings, plaintiff never established any line of commerce. Accordingly, no meaningful section of the country could have been or was established, and the court finds that the plaintiff failed to prove any relevant section of the country.

24. Nevertheless, the court has carefully considered the allegations and proof of the government that there were 10 relevant sections of the country ranging from the nation as a whole down to Houston, Texas, and has carefully considered the evidence as to the business, whatever it may be called, including the so-called "production and sale of prefabricated metal buildings", engaged in by Stran, Metallic and the other business entities about which evidence was adduced, in each of such alleged sections of the country and the court finds that, even if the government had established a relevant line of commerce, the government failed to prove that any one or more of the 10 alleged sections of the country constitutes an appropriate or meaningful section of the country for purposes of Section 7 of the Clayton Act.

RECORD REFERENCES: See cross-examination of government witness Mitchell, Tr. 840–861.

### Effect Upon Competition

25. In order to determine whether any acquisition may tend substantially to lessen competition or to create a monopoly, it is necessary to determine

a line of commerce and a section of the country in which the effect of the acquisition is to be measured. As indicated in the findings above, the court has found that the plaintiff has failed to prove that the so-called "production and sale of prefabricated metal buildings" constitutes a relevant line of commerce and has failed to prove that any one or more of the alleged sections of the country constitutes an appropriate section of the country. Nevertheless, the court has carefully considered the allegations and proof of the government concerning the alleged line of commerce and the alleged sections of the country, together with the allegations and evidence of the government that the acquisition may tend to substantially lessen competition or to create a monopoly in the alleged line of commerce in one or more sections of the country, and the court finds that even if the government had established said line of commerce and said sections of the country the government failed to prove that there is a reasonable probability that in any alleged section of the country, the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in the alleged line of commerce.

RECORD REFERENCES: Appendix A, pp. 1–40, 245–249, 261–296; Appendix B, pp. 1–13, 205–228.

26. By the overwhelming preponderance of the government's own witnesses' testimony, there is no cost, technological or other barrier to entry into the so-called "production and sale of prefabricated metal buildings". New entrants are in fact plentiful, and there are many more companies in this business today than at the time of the acquisition.

RECORD REFERENCES: See Finding 30, infra; G-488 (Pascoe deposition) pp. 25–26, 34, 53–54; G-473 (Fears deposition) pp. 66–67. Appendix A, pp. 289–296.

27. According to the government's own evidence, all so-called "prefabricated metal building" companies began business since 1941. The Reddick-Gertler Report by the United States Department of Commerce, G-483 (Larkin deposition) G-2, stated that there were approximately 70 companies in the metal building business in 1957 and the government in this suit admitted that there were at least 144 companies in the business for the 1957–1959 period. Thus, the government's own figures clearly demonstrate that the number of so-called "prefabricated metal building" companies has more than doubled in size in 2 years.

RECORD REFERENCES: G-474 Fortier deposition) p. 32; Complaint Paragraph 13; Tr. 784.

28. In this case, the government conducted a "census" of the "prefabricated metal building industry" for the years 1957, 1958, and 1959, and sent questionnaires to over 500 firms. It concluded that for the 1957–59 period there were 144 companies in what it called the "prefabricated metal building industry". Based on the returns from these 144 companies, the government prepared a number of statistical exhibits which purported to present statistical evidence concerning the distribution of sales, industry structure, market shares, and concentration figures for the "prefabricated metal building industry". These exhibits, GS-42 through GS-74, were admitted into evidence. However, because of the following reasons, which were brought out clearly during the cross-examination of government witness Mitchell (Tr. 896–1129; 1164–1178; 1181–1182), the "census" and the statistical exhibits based thereon are completely defective, do not accurately present statistics of the "prefabricated metal building industry", and are not entitled to any weight whatsoever.

(a) The definition of "prefabricated metal buildings" used in the "census" was misleading, does not coincide with the allegations of the complaint concerning "prefabricated metal buildings", is different from the definition given by plaintiff's answer to defendants' Interrogatory No. 4, and was not even followed by the government in the actual conduct of the "census". During the conduct of the "census", various restrictions were imposed in

letters, visits and telephone conversations by government counsel and economist to the definition stated in the "census" with the result that many companies were excluded from the government's final list of companies in the "prefabricated metal building industry" because of one or more of these added restrictions. Even these added restrictions were not used consistently. Finally, many companies gave negative answers to the "census" under circumstances that made it clear that such companies were misled and confused by the definition appearing in the "census".

(b) In many cases the basis for excluding a company from the government's final list was not the company's response to the "census", but rather a personal determination made by employees of the Department of Justice based on telephone calls, personal visits or both. The content of these telephone calls and visits is reflected only in notes prepared by employees of the Department of Justice stating that the interviewed company was excluded for one or more reasons. In many instances, the reason for exclusion is unrelated to anything appearing on the questionnaire sent out by the government and represents an additional restriction on the stated definition of a "prefabricated metal building".

(c) Although the "census" covered only one post-acquisition year, 5 years actually elapsed between the challenged acquisition and the trial of this case. Statistics covering any of the years 1960, 1961, 1962, and 1963 would be highly relevant and desirable in measuring the competitive impact, if any, of this challenged acquisition. The exclusion by the government of these 4 additional post-acquisition years further weakens and dilutes the results of the "census" and the statistical exhibits based thereon. Evidence developed during the government's own case proved that there has been a flood of successful new entrants since the acquisition (see, e. g., Finding 30, infra). The failure of the "census" to reflect the enormous development of these new companies underlines and magnifies its inadequacy.

(d) Because the government "census" ignored completely the intense competition between companies fabricating metal buildings or parts for metal buildings and all other forms of construction, the statistical exhibits offered at trial are not merely lacking in accuracy in regard to the so-called "prefabricated metal building industry", but also cannot be relied upon to portray accurately the actual competition confronted by Stran and Metallic in the marketplace.

(e) The government "census" was conducted by an economist employed by the Department of Justice. At trial, he testified at considerable length on the conduct of that "census" including his personal visits with and telephone calls to many of the companies surveyed, and his reliance on various additions to the definition of "prefabricated metal buildings" appearing on the "census" forms. Moreover, his cross-examination revealed that there had been a flood of highly successful new entrants since the acquisition. Based on his testimony and demeanor at trial, the court finds that his conclusions are not entitled to any weight.

29. Although the government "census" included only a single post-acquisition year, the evidence that was developed by the "census" demonstrated that in fact the challenged acquisition had no anticompetitive effect. As is reflected on the government's own statistical exhibits, and admitted by the government's economic witness, the combined market share of Stran and Metallic actually declined after the acquisition in every relevant market contended for by the government. Moreover, a great many companies included in the "census" showed substantial increases in sales for the period from 1957 to 1959.

RECORD REFERENCES: Cross-examination of government witness Mitchell, Tr. 896–918; Appendix B, pp. 11–13.

30. Although the government "census" stopped in 1959, the evidence developed from government witnesses and during the presentation of the government's case disclosed enormous growth and expansion of new and recently organized companies since the acquisition. In 1959 Metallic's total annual sales were slightly over $6 million. Since that time new independent metal building companies have multiplied in number and size and have in fact replaced the Metallic sales volume several times over. Several of these new companies should be noted:

(a) Mes-Tex Construction Co. of Houston, Texas, began in 1959 (according to Government census) with paid in capital of $7,500 and reported to the Government census slightly over $800,000 in sales for 1959. Nevertheless, by 1963 Mes-Tex's annual sales had grown incredibly to over $8 million. (Tr. 1104–1107, D–31, Mitchell Cross-examination.)

(b) Delta Steel Building Company of Dallas, an ex-Metallic dealer, began in 1960, after the acquisition, and by 1963 reported sales over $2,500,000. (Tr. 1015–1016, D–4, Mitchell Cross-examination.)

(c) A & S Steel Buildings, Inc. of Houston, began in 1958, but by March, 1963, reported annual sales of $1,750,-000. (Tr. 1016–1017, D–5, Mitchell Cross-examination.)

(d) Dixiesteel Buildings Inc. of Georgia, a subsidiary of Atlantic Steel Co. of Georgia, began making metal buildings in 1960 and recently reported annual sales of over $5,500,000. (Tr. 1046–1050, D–10, Mitchell Cross-examination.)

(e) Big Dutchman Dur-A-Frame Division of Automatic Poultry Feeder Co., Inc. of Zeeland, Michigan, began in 1959 to manufacture steel trusses for rigid frame structures, and a recent report reflects sales over $7,000,-000 annually. (Tr. 1054–1061, D–13, Mitchell Cross-examination.)

(f) Mississippi Valley Structural Steel Co. is a large company with sales in excess of $20 million annually and with manufacturing plants in Illinois, Missouri, Michigan, and Tennessee. In 1962 this company began manufacturing a steel frame building from standard designs and this activity is carried on at all of its plants. At this date, the amount of its sales attributable to this aspect of its operation is not known. (Tr. 1063–1066, D–15, Mitchell Cross-examination.)

(g) Morgan Dallas Corp. of Dallas, Texas, began manufacturing metal buildings in 1959. The sales of Morgan Dallas, together with the sales of its affiliate M P Building Corp., exceed $500,000 annually. (Tr. 1085–1086, D–20, Mitchell Cross-examination.)

(h) Republic Manufacturing Co. of Ft. Worth, Texas, began operations in 1961 and recently reported annual sales of over $250,000. (Tr. 1087–1089, D–21, Mitchell Cross-examination.)

(i) Tomar Products Inc. of Rochester, New York, began in 1958. This company manufactures single story metal buildings of its own design and Sears Roebuck is one of its biggest customers. Its annual sales approach $500,000. (Tr. 1095–1098, D–27, Mitchell Cross-examination.)

(j) Allison Steel Manufacturing Co., Inc. of Phoenix, Arizona, which the government stated had gone out of the "prefabricated metal building" business, recently started producing single story metal buildings. (Tr. 1099–1101, D–29, Mitchell Cross-examination.)

(k) A E & F Inc. of Niles, Ohio, recently announced that it was going to fabricate metal buildings which would be sold throughout the United States. (Tr. 1114–1115, D–35, Mitchell Cross-examination.)

(l) Best Steel Buildings of Houston, Texas, began in 1961 and recently re-

ported annual sales in excess of $200,-000. (Tr. 1117–1119, D–39, Mitchell Cross-examination.)

(m) Lundell Mfg. Co., Inc., of Cherokee, Iowa, began manufacturing metal buildings during 1963. Its total volume is just developing, however, and current annual sales are estimated to be over $200,000. (Tr. 1120, D–41, Mitchell Cross-examination.)

(n) K. C. Portable Building Sales Co., Inc., of Robstown, Texas, began in 1960 to make metal buildings. (Tr. 1119, D–40, Mitchell Cross-examination.)

(o) Met-L-Fab Mfg. Co., Inc. of New Iberia, Louisiana, began manufacturing metal buildings in 1963 and its sales at this date are not known. (Tr. 1122–1123, D–43, Mitchell Cross-examination.)

(p) Pam-Tex Corp. of Pampa, Texas, was incorporated December 27, 1962, and a recent report states that its sales were over $252,000 annually. Its volume is reported to be "increasing substantially". (Tr. 1123–1124, D–44, Mitchell Cross-examination.)

(q) Madison Steel Builders Inc. of Georgia, a subsidiary of Madison Builders Inc. of Los Angeles, began business in 1962 specializing in fabricating metal buildings but its sales at this date are not known. (Tr. 1126–1127, D–48, Mitchell Cross-examination).

(r) James Erwin Young of Lubbock, Texas, began April, 1962, with starting capital consisting of "low figure bank loan". Owner is a student at Texas Tech college. Sales volume has steadily increased. (Tr. 1124–1126, D–46, Mitchell Cross-examination.)

(s) Porta-Kamp Mfg. Co., Inc., of Houston, Texas, "from modest beginning in 1955, this business has made steady progress and annual sales reported now in excess of $1,000,000 with operations profitable." (Tr. 1127–1128, D–50, Mitchell Cross-examination.)

(t) Metal Structures Corp. (Mesco) of Grapevine, Texas, is not a new entrant but it should be noted that it reported to the government "census" sales of under $800,000 for 1959. Since that time the sales volume of this Texas corporation has increased to over $3,-000,000 annually. (Tr. 1107–1108, D–32, Mitchell Cross-examination.)

Thus, Houston-based Mes-Tex alone has multiplied 10 times since 1959 and has alone more than replaced Metallic as a competitive force. Three new Texas companies taken together, Mes-Tex, Delta and A & S, now have a sales volume of twice Metallic's 1959 total; and the combined sales volume of just the Texas companies mentioned above is about three times Metallic's 1959 total.

31. By the overwhelming preponderance of the testimony of the government's own witnesses, the acquisition in question has had no anticompetitive effect. This testimony came from competitors of Metallic, dealers in "metal buildings", and purchasers of "metal buildings", and established that the competitive situation today is far healthier than at the time of the acquisition.

RECORD REFERENCES: Appendix A, pp. 1–40; Appendix B, pp. 1–13.

32. Before the acquisition, competition between Stran and Metallic was insubstantial and insignificant, and this acquisition did not eliminate any substantial or significant competition between Stran and Metallic. Before 1959, in the areas where both Stran and Metallic made sales, Stran's sales were primarily in the farm market and Metallic's sales were primarily in the commercial and industrial market.

RECORD REFERENCES: G–473 (Fears Deposition) pp. 36–37, 60; G–491 (Sefeik deposition) pp. 40–41. Appendix A, pp. 277–288; Appendix B, pp. 219–221.

33. Because of transportation costs, the location of its plant in Terre Haute, Indiana, product limitations, and high costs, Stran was not an effective competitor before the acquisition in areas

where Metallic was most active. Stran's purpose in acquiring Metallic was to overcome these barriers, to secure the know-how of Metallic's management, and to penetrate those areas.

RECORD REFERENCES: G–5; G–468 (Crom deposition) p. 12; G–487 (McVey deposition) p. 21. Appendix A, pp. 277–288; Appendix B, pp. 219–221.

34. Plaintiff has failed to prove that there is any reasonable probability steel producers in competition with National and its subsidiaries might be foreclosed from selling steel to Metallic or any other company.

35. Plaintiff has failed to prove that there is any reasonable probability that the acquisition in question might foster acquisitions of other independent "prefabricated metal building manufacturers" by integrated steel producers.

36. Plaintiff failed to prove that there is any reasonable probability that, as a result of the acquisition in question, Metallic will have a guaranteed source of supply for its steel requirements.

37. The government's own evidence is overwhelming and the court finds that there is no reasonable probability that this acquisition will lessen competition or tend to create a monopoly in any section of the country or in the United States as a whole.

## CONCLUSIONS OF LAW

1. In all respects as set forth in the foregoing findings of fact.

2. The acquisition by Stran of the stock of Metallic has had no adverse effect on competition and has not tended toward monopoly in any line of commerce in any section of the country; and there is no reasonable probability that this acquisition will substantially lessen competition or tend toward monopoly in any line of commerce in any section of the country.

3. Plaintiff has failed to prove by a preponderance of the evidence that the "production and sale of prefabricated metal buildings and component parts thereof" is a relevant line of commerce within the meaning of Section 7 of the Clayton Act (15 U.S.C.A. § 18).

4. Plaintiff has failed to prove by a preponderance of the evidence that any one or all of the alleged sections of the country are appropriate sections of the country within which to measure the effect, if any, on competition of the acquisition in question within the meaning of Section 7 of the Clayton Act.

5. Plaintiff has failed to prove by a preponderance of the evidence that the effect of the acquisition in question may be substantially to lessen competition or tend to create a monopoly in the "production and sale of prefabricated metal buildings and component parts thereof" in any section of the country.

6. Plaintiff has failed to prove by a preponderance of the evidence that the acquisition in question violated Section 7 of the Clayton Act (15 U.S.C.A. § 18).

7. Defendants have not violated Section 7 of the Clayton Act (15 U.S.C.A. § 18).

The clerk will notify counsel to draft and submit Judgment accordingly.