**UNITED STATES of America**
v.
**TIDEWATER MARINE SERVICE, INC., Twenty Grand Marine Service, Inc., Tidex, Inc., and Pan Marine Service, Inc.**
**Civ. A. No. 68–97.**

United States District Court
E. D. Louisiana,
New Orleans Division.
April 12, 1968.

Louis C. LaCour, U. S. Atty., New Orleans, La., Milton J. Grossman, Harrison J. Sheppard, Joel R. Bennett, U. S. Dept. of Justice, Washington, D. C., for United States.

Louis B. Porterie, Duke & Porterie, New Orleans, La., Robert A. Bicks, Robert J. Bagdasarian, David S. Patterson, Breed, Abbot & Morgan, New York City, for Tidewater Marine Service, Inc., and Tidex, Inc.

Charles Kohlmeyer, Jr., Lemle & Kelleher, New Orleans, La., for Twenty Grand Marine Service, Inc., and Pan Marine Service, Inc.

HEEBE, District Judge:

This cause came on for hearing on January 26, 1968, on the plaintiff's motion for a preliminary injunction. We denied the motion on February 9, 1968, for reasons fully explained herein.

### REASONS

The United States instituted this suit to enjoin a proposed merger between Tidewater Marine Service, Inc. (Tidewater) and Twenty Grand Marine Service, Inc. (Twenty Grand) under an agreement entered into between these companies on August 25, 1967, on the grounds that the proposed merger may substantially lessen competition or tend

to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The same relief is sought for the same reason against the proposed acquisition by Tidex, Inc. (Tidex) of all the outstanding shares of stock of Pan Marine Service, Inc. (Pan Marine), affiliated corporations of Tidewater and Twenty Grand respectively, which plan to effectuate the proposed stock acquisition when the Tidewater-Twenty Grand merger is consummated.

Tidewater is primarily engaged in the business of providing supply and utility boats, crew boats, tugboats, and other marine equipment to oil companies, drilling contractors, and others engaged in the offshore exploration, recovery and production of petroleum products, and to companies engaged in oceanographic research. The vessels chartered by Tidewater include large supply boats used to carry drill pipe, drilling mud, diesel fuel, drilling water, and miscellaneous equipment from shore to offshore drilling rigs which are located up to 100 miles off the Gulf Coast; launches for transporting personnel and food to offshore platforms; tugboats used to tow barges and drilling platforms; and barges for transporting oil and other products. Approximately 75% of Tidewater's boats are service craft used to carry personnel and supplies; tugboats and barges constitute the bulk of the remaining 25%. Tidewater operates off both the Gulf Coast and West Coast of the United States (including Alaska) as well as in and around Canada, Mexico, Nigeria, Trinidad, Venezuela, Africa, the Persian Gulf, the Gulf of Suez and the North Sea. Approximately 68% of its revenues are derived from its operations in the coastal waters of the United States.

While the bulk of Tidewater's business consists of chartering offshore service craft to transport personnel and supplies, Twenty Grand secures only approximately 30% of its revenues from the chartering business and only slightly less than 30% of its vessels are engaged in this activity. The remainder of Twenty Grand's revenues are acquired from offshore towing (about 40%) and inland operations (about 30%). Twenty Grand operates its charter business principally in the coastal waters of the United States, but like Tidewater, although not nearly as extensively, also conducts some business in foreign waters.

Practically all of the boats chartered or leased by Tidewater and Twenty Grand for operation in the coastal waters of the United States are chartered under bareboat charter. This is a charter whereby the chartering firm leases the vessel without crew or supplies to a customer, and the customer mans, maintains and operates the vessel either directly or through an operator for the duration of the charter. In almost all cases Tidewater's customers enter into a contract with Tidex or one of its subsidiaries whereby Tidex or the subsidiary mans, operates and maintains the vessel for the chartering party.[1] Similarly, Pan Marine is usually the operating company for boats chartered by Twenty Grand.

The government alleges that the proposed merger between Tidewater and Twenty Grand and the acquisition of Pan Marine's stock by Tidex may substantially lessen competition or tend to create a monopoly in the chartering and operation of offshore tugboats as well as supply and utility boats used to transport cargo and equipment in connection with petroleum operations offshore the United States, offshore the Gulf Coast of the United States and offshore the Pacific Coast of the United States in violation of Section 7 of the Clayton Act in that it

1. The reason for this, as stated by the government, is that when the owner of an offshore vessel operates it for another person, the owner is deemed to be engaged in the business of carrying passengers or freight for hire and is thereby subjected to certain Coast Guard regulations which increase the cost of operating the vessels. The applicability of the regulations may be avoided by the use of the bareboat charter and a manning company, thus decreasing costs. However, this assertion was never developed by the government, and we have no reason to believe that it would affect the outcome of this case.

will (1) eliminate actual and potential competition between Tidewater and Twenty Grand and between Tidex and Pan Marine, and (2) further increase industry-wide concentration. On this basis the government seeks to enjoin the proposed merger and stock acquisition.

## I. RELEVANT PRODUCT MARKET

Section 7 of the Clayton Act provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

■ It is essential that the government establish the "line of commerce" or "relevant product market." United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). We are presently concerned only with the phase of defendants' operations which involve chartering service craft to transport men and supplies to the offshore oil industry.[2] The government contends that the relevant line of commerce consists of furnishing offshore supply and utility vessels used to transport cargo and equipment. The defendants, on the other hand, maintain that it consists of supplying offshore service craft to carry both personnel and cargo. Inasmuch as the government contends that the transportation of cargo is the relevant product market, the optimum approach would have been to determine the amount of cargo that was transported to offshore facilities and the competitive position of defendants relative to that total. However, for obvious reasons this was impractical, and the government sought instead to measure the alleged line of commerce by the number of supply and utility boats engaged in the business. The approach of counsel for all parties herein was thus directed to the boats themselves rather than transportation *per se* as the line of commerce. We will also adopt this approach because it affirmatively appears from the evidence herein that the transportation of cargo via boats other than supply and utility boats is so slight as to be relatively insignificant when compared to the amount of cargo transported by supply and utility boats. Thus, supply and utility boats are not merely a unit of measurement but may themselves be considered, for practical purposes, as the line of commerce as the following factors indicate.

There are three basic types of service craft used to provide offshore transportation—supply boats, utility boats, and crew boats. While the three basic types are recognized throughout the marine transportation and offshore oil industries, they may be referred to by different names; for example, supply boats may be called cargo boats, utility boats may be called standby boats or production boats or work boats or supply-personnel boats, and crew boats may be called personnel carriers or launches.[3]

Each type of boat is intended to perform a different function, and thus there

2. The government's complaint, alleging that Twenty Grand owns "16 large offshore, ocean-going tugboats" and that Tidewater owns "29 tugs," claims that the merger of the defendants' towing operations would also violate § 7. However, the government has failed to offer any evidence whatsoever regarding this claim. In its brief at footnote 2 on pages 8–9, the government, candidly admitting that it was unable to go forward on this claim, virtually abandoned it. Likewise, the government has completely failed to offer any evidence relevant to its broad allegations concerning the agreement between Tidex and Pan Marine. Consequently, we may exclude all of these allegations from our present consideration of this case.

3. See footnote 7, infra.

are significant differences in their design and construction, the most striking differences being between supply boats and crew boats. Crew boats are designed to carry a large number of passengers at high speeds. Considering that as many as fifty men may be transported at any one time, there is considerable cost involved in transporting personnel, especially for an operation which is some distance offshore, because the companies operating offshore oil facilities have to pay the workers, who work in shifts of so many days, while they are traveling to and from shore. Thus, speed is essential. In addition to transporting crew shifts, crew boats are continuously used to transport miscellaneous personnel in emergency and other situations where speed is also at a premium. Consequently, crew boats are generally high-powered vessels with planing hulls constructed of lightweight aluminum for maximum speed approaching 30 m. p. h. They are also constructed with passenger comfort in mind; for example, the seats are often the reclining type. Crew boats are also capable of carrying small amounts of cargo, such as groceries and small tools, varying in weight but seldom exceeding five tons.

Supply boats, on the other hand, are designed for transporting large quantities of cargo ranging up to 600 tons in weight. Thus, they are generally steel hulled vessels built for maximum stability under all conditions. They are usually capable of making only 10–12 knots. Supply boats sometimes carry passengers when it would be more convenient to do so or when inclement conditions prohibit a crew boat from making the journey. Utility boats are designed with facilities to accommodate as many as 40 passengers, although the number is usually smaller. But because utility boats are also designed to carry large amounts of cargo, generally slightly less than one-half as much as supply boats, they are also displacement hull vessels, and thus, like supply boats, are slow.

The boats servicing the offshore oil industry range in length from 40 to 165 feet; the farther offshore a boat must range, the larger it must be. Smaller inland craft are incapable for both safety and practical reasons from venturing very far offshore. Supply boats are generally longer than crew boats, with utility boats a medium length, although in any one given instance a crew boat may exceed a supply boat in length. Naturally, the cargo or passenger carrying capacity of a vessel will be determined by its size.

Supply boats cost more to construct than crew boats. The cost of supply boats generally ranges from $200,000 to over $700,000, depending on the length, quality, equipment, cost of labor, etc. The cost of crew boats generally ranges from $75,000 to over $300,000, depending on the same factors. However, if a crew boat and a supply boat are the same length, it usually costs more to construct the crew boat. Further, while the life expectancies of the vessels vary, it appears that crew boats last only about one-half as long as supply boats. Because of these factors, it costs more to charter crew boats than to charter supply boats. Crew boats, however, generally require only a two- or three-man crew whereas supply boats require a four- to six-man crew.

Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), authoritatively delineated a number of practical indicia to be considered in determining whether a particular submarket exists within the outer boundaries of a broad product market.[4]

"The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct

4. The practical indicia clearly enunciated in *Brown Shoe* were based upon criteria well established by lower courts. See Bock, Mergers and Markets (3rd ed. 1964) pp. 96–111, (2nd ed. 1962) pp. 56–68, and cases cited therein.

customers, distinct prices, sensitivity to price changes, and specialized vendors." At 325, 82 S.Ct. at 1524.

It is generally agreed by those in the industry that the overall business of providing boats for the offshore oil industry is the same and requires the same skills and know-how whether the boats be used to transport men or materials. Thus, one who charters crew boats is just as capable of chartering supply and utility boats, and vice versa. This is repeatedly emphasized by the defendants. However, to attach significance to this would be to ignore the very terms of the Act itself which refers to *any* line of commerce, as well as the resulting admonition in *Brown Shoe* that the focus must be on "economic entity." As stated in United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958) at 592: "Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful."

In this case the peculiar use or function of the boats, which is recognized throughout the industries involved, is the crucial factor, and it highlights the existence of separate economic entities. To ignore the vital functional distinction herein "in determining the relevant line of commerce is to ignore the single, most important, practical factor in the business." United States v. Aluminum Co. of America, 377 U.S. 271, 276, 84 S.Ct. 1283, 1287, 12 L.Ed.2d 314 (1964). Cf. Erie Sand & Gravel Co. v. Federal Trade Commission, 291 F.2d 279 (3rd Cir. 1961). Crew boats are designed for high speed transportation of personnel and are constructed accordingly. The rapid movement of men is their task first and foremost, and it is only incidentally that they move cargo, and then only in comparatively negligible amounts. Supply and utility boats, on the other hand, are geared for the dependable movement of huge quantities of cargo, and transport men only when the circumstances necessitate. To adopt an analogy first drawn by William E. Bright, former President of Tidex and now Vice President of Tidewater, crew boats may be considered as taxicabs, utility boats as pick up trucks or carryalls, and supply boats as heavy duty trucks. When a customer wants to transport men, he will not seek bids on supply or utility boats—he wants crew boats. Likewise, when the customer wants to transport cargo, he will seek bids on supply or utility boats and not crew boats. These facts, coupled with the fact that crew boats cost considerably more to charter than supply or utility boats, demonstrate the lack of sensitivity to the price of crew boats vis-a-vis the price of supply or utility boats. The customer will acquire the type of boat needed to meet his transportation requirements with little regard to the price or availability of the other types of boats.

The fact that, to a certain extent, one type of boat may perform the function of another type of boat does not alter our view of this case because this interchangeability is very limited. There will always be a certain amount of market overlap or limited functional substitution; but the slight overlap in this case is clearly within tolerable limits consistent with the existence of an economically significant submarket. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Aluminum Co. of America, supra; United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. E. I. Du Pont De Nemours & Co., supra; United States v. Kimberly-Clark Corp., 264 F.Supp. 439 (N.D.Cal.1967); United States v. Pennzoil Co., 252 F. Supp. 962 (W.D.Pa.1965). As noted above, crew boats are generally incapable of carrying over five tons of cargo, and they rarely carry even that much. Such cargo transportation is certainly *de minimis* when compared to the several hundred tons of cargo carried by the supply and utility boats. Likewise, even though supply boats and, to a greater extent, utility boats are capable of carrying personnel, they seldom do because they are so slow and the wage meter is ticking all the way out to the rig. Thus, supply

and utility boats do not compete with crew boats for the transportation of personnel even though they may be physically capable of personnel transportation. However, even if they did compete for personnel transportation, this fact would be irrelevant in this case inasmuch as the line of commerce urged by the government is the transportation of supplies and equipment. Thus, we must look to the type of boats capable of transporting supplies and equipment. It matters not that such boats may also perform other functions. See United States v. Grinnell Corp., supra; United States v. Pennzoil Co., supra.

◼ This places the spotlight on the crucial and singular issue here which is whether crew boats compete with supply and utility boats. It is clear that competition is the key to determining the relevant market. United States v. Grinnell Corp., supra; United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Philadelphia Nat'l Bank, supra; Brown Shoe Co. v. United States, supra; United States v. Pennzoil Co., supra; United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y. 1965). The relevant market will include those products or services which may be in competition and will exclude those which do not compete. Here the fact is inescapable that crew boats simply do not, for financial reasons, and cannot, for physical reasons, compete to any significant degree for cargo transportation with supply and utility boats.

◼ Nor can the chartering of offshore service craft be deemed a "cluster of services." Cf. United States v. Philadelphia Nat'l Bank, supra; United States v. Grinnell Corp., supra, an analogous case. In Philadelphia Nat'l Bank the court found that "commercial banking is a market *'sufficiently inclusive* to be meaningful in terms of trade realities'" (emphasis added) 374 U.S. at 357, 83 S.Ct. at 1738, because the banking services provided by commercial banks were free or insulated from effective competition with the products and services of other financial institutions. Similarly, the accredited central station property protection service in *Grinnell* was found to be a "single basic service" because there could be no effective competition with the substitutes as they were unacceptable or unrealistic alternatives. In both of these cases, therefore, the Supreme Court found that the broad product market, composed of various component services, was such an integrated whole or total package, so to speak, that it was free from effective competition with businesses which furnished less than the total of component services.

◼ In our case, however, many firms, for one reason or another, and often merely because of personal wishes, engage in the business of chartering supply and utility boats to the exclusion of crew boats and vice versa. Yet it is clear that Tidewater and Twenty Grand are in active competition with such firms particularly in view of the fact that the offshore oil companies generally acquire vessels on a boat-by-boat basis according to their needs and without regard to any total package service. Obviously, then, in this case there is no "single basic service."

◼ For these reasons we think it is commercially realistic to consider the transportation of supplies and equipment as a separate economic entity, and we accept the government's delineation of the relevant product market as supply and utility boats.

## II. RELEVANT GEOGRAPHICAL MARKET

Offshore oil operations are conducted in the coastal waters of the United States only off the Gulf Coast and the West Coast (including Alaska). Consequently, the marine transportation industry is limited to these two areas. It is apparently unprofitable to shuttle boats back and forth between the West Coast and the Gulf Coast, and for this reason a boat which commences operation in one of these two areas almost always stays in that area.

The government claims that the anticompetitive effect of the proposed merger must be tested in three geographical areas—offshore the United States as a whole, offshore the West Coast, and offshore the Gulf Coast. The defendants claim that our consideration is limited to the Gulf Coast.

Without belaboring the point, it is sufficient if the merger may substantially lessen competition "in any section of the country." "Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in * * * every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." United States v. Pabst Brewing Co., 384 U.S. 546, 549–550, 86 S.Ct. 1665, 1668, 16 L. Ed.2d 765 (1966).

■ However, there must be an "economically significant" area. Brown Shoe Co. v. United States, supra. Again, the focus is on competition; this time the question being "Where?" and not "What?" The relevant geographical market is that area "where * * * the effect of the merger on competition will be direct and immediate." United States v. Philadelphia National Bank, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). "This depends upon 'the geographic structure of supplier-customer relations.'" Ibid. "Therefore * * * the 'area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies*'. * * *" (emphasis in original) Id. at 359, 83 S.Ct. at 1739. While we have no doubt whatsoever that both the Gulf Coast and West Coast areas are proper geographical markets in

which to test the effect of the proposed merger, we are unable to accept the government's assertion that the coastal water of the entire nation is a proper geographical market, the reason being simply that the boats in one area are not available for operation or competition in the other. Under *Philadelphia National Bank* this bare practical factor precludes considering the national market as a relevant market. We do not feel that the sweeping language in *Pabst* scuttled the guidelines set out in *Philadelphia National Bank.* Consequently, commercial realities limit the relevant geographical markets to offshore the Gulf Coast and offshore the West Coast.

■ In so holding, we reject the defendants' contention that the West Coast is not a relevant geographical market, which contention is based on the fact that Twenty Grand operates its West Coast chartering business through Twenty Grand Pacific, a corporation 50% owned by Twenty Grand and 50% owned by an individual named Kenneth Elmes. The very terms of § 7 defeat this argument since the Act proscribes the acquisition "directly or *indirectly* [of] the whole or *any part of the stock*" (emphasis added) of another corporation if the effect may substantially lessen competition in any section of the country. Thus, the fact that Twenty Grand Pacific is only 50% owned by Twenty Grand is irrelevant inasmuch as Tidewater will acquire 50% ownership of Twenty Grand Pacific through the acquisition of Twenty Grand's stock.[5] This being so, the West Coast is a proper geographical market in which to measure the anticompetitive effect of this merger.

As we note in Part III below, the government has failed to offer statistical data relating to the Gulf Coast and West Coast; the only statistics which are

5. The fact that Elmes and Twenty Grand have engaged in some negotiations designed to effect the purchase by Elmes of Twenty Grand's ownership in Twenty Grand Pacific is also irrelevant and does not preclude our consideration of the West Coast as a relevant market. There is no certainty or even probability that Elmes will buy out Twenty Grand. Such negotiations directed to possible future developments do not alter the present effect of the Tidewater-Twenty Grand merger upon competition.

supported by evidence are directed to the total of both markets without any breakdown between the two. However, this does not preclude our consideration of this evidence because if the government's allegations as to the national totals are correct—that the combined market share of Tidewater and Twenty Grand is 31%—it follows that the market share in both component markets is 31%, or that the market share is greater than 31% in one market and less in the other.

We now turn to the crucial question of whether the merger may substantially lessen competition.

## III. EFFECT ON COMPETITION

The complaint alleges that Tidewater is the largest company in the country engaged in the business of furnishing marine transportation to the offshore petroleum industry and that Twenty Grand is the second largest. The government also alleges that approximately 400 supply and utility boats are available for charter in the United States coastal waters and that Tidewater owns approximately 19% (76, including two under construction) and Twenty Grand 12% (47) of all such vessels, and that together they own approximately 31% of the national total. The complaint further states that in 1967 approximately 350 supply and utility boats were chartered for operation off the United States coasts and that Tidewater accounted for about 16% (55) of all such vessels and that Twenty Grand accounted for approximately 10% (34). It is further alleged that of the 350 supply and utility boats allegedly chartered for operation in the United States coastal waters in 1967, about 300 were operated in the Gulf of Mexico. Tidewater allegedly accounted for approximately 13% (41) of the supply and utility boats operated in the Gulf of Mexico in 1967 and Twenty Grand accounted for approximately 9% (27) of all such vessels. Of the approximately 41 supply and utility boats allegedly chartered for operation offshore the United States Pacific Coast in 1967, the government claims that Tidewater ac-

counted for about 35% (14) of all such vessels and Twenty Grand approximately 15% (7) of these vessels. The government claims that the merger of these alleged market shares constitutes a *prima facie* violation of § 7, and hence that it need not prove any particular anticompetitive effects at this stage.

The figures and percentages proffered by the United States were obtained as a result of a survey conducted by the government attorneys, which survey was necessitated by the lack of complete data on the offshore marine transportation industry. The government acquired a list of firms believed to be engaged in the offshore marine transportation industry from the defendants which the defendants later supplemented with additional names. The government also acquired a list of insured boats and barges from the Chevron Oil Company, as well as a list of companies from the "Oil and Gas and Marine Guide," an industry publication. When the firms on these various lists were contacted by the Antitrust Division staff, they were asked to supply the names of other firms which might be in competition with the defendants. These latter firms, when contacted, were requested to do the same thing, and so on in chain letter fashion.

In this manner the names of 429 companies were obtained, 29 of which were subsidiaries or affiliates of others, and thus stricken. Of the remaining 400, 48 companies could not be located, 5 could not be contacted, 6 had gone out of business, and 1 declined to respond. The government asserts that only 86 of the other 340 firms are in competition with Tidewater and Twenty Grand because 254 either own no offshore supply or utility boats or do not charter their vessels for hire.

The interviews were conducted almost exclusively by telephone. In each case, the person interviewed was either the owner or a knowledgeable executive officer. Basically, the government inquired simply as to how many boats the company owned, and the size and type (supply,

utility, crew, tug, barge, etc.) of each. The data acquired by this telephone interview was partially confirmed by letter. The goverment mailed 333 confirmation letters to the above 400 firms, and received 242 responses. Of the 242 replies, 4 companies indicated that they owned a total of 7 supply and utility boats less than the government had attributed to them. This was somewhat offset, however, by the response of three other firms stating that they owned a total of 3 more supply boats than the telephone survey had indicated.

The results of the government survey were tabulated, prior to the receipt of the confirmation letters, in rough fashion and filed as exhibits in the record. One such tabulation (Exhibit 2B) seems to indicate the total number of supply and utility boats available for charter from American firms in 1967, including those vessels actually operating in foreign waters but which are registered in the United States, and thus not prohibited by law from operating in United States coastal waters. See 46 U.S.C. § 883. Exhibit 2B indicates that the number of such boats totals 396, and that Tidewater owns 76 and Twenty Grand owns 47. It also ranks the companies, purportedly numbering 13, owning five or more such vessels in order of size, indicating the number of boats each owns which ranges from 19 to 5 excluding Tidewater and

Twenty Grand together with each company's percentage of the total, which ranges from 4¾% to 1¼%. The percentage owned by Tidewater and Twenty Grand per Exhibit 2B are 19% and 11¾%, respectively. The other tabulation (Exhibit 2C) simply seems to assert the estimated number of supply and utility boats actually chartered for operation in United States coastal waters by Tidewater and Twenty Grand in 1967 compared to the total for all other companies combined. It reflects Tidewater and Twenty Grand as having chartered 87 vessels which is actually 25.6% (not 22% as indicated on the exhibit) of the purported total of 340. The only data offered by the government to support these tabulations were a copy of the interview form, a listing of the 429 firms contacted with the number and type of boats owned by each, and the 242 confirmation responses.[6]

The defendants do not dispute the number of supply and utility vessels attributed to their ownership in Exhibit 2B. A severe difference of opinion does exist, however, respecting the total number of supply and utility boats available for charter in United States coastal waters as reflected in Exhibit 2B. Before turning to consider the defendants' contentions, we pause to consider the government's evidence which we set forth in detail above. The government has

6. This underlying evidence offers support, albeit scanty, only for the government's allegations as to the boats *available* for charter off the United States coasts which includes boats of United States Registry operating in foreign waters. It offers no support whatsoever for the tabulated allegations as to the total number of boats which *actually operate* in United States coastal waters. The former is directed to potential competition while the latter is directed to actual competition. The government did not draw any distinction between the two nor did it offer any evidence as to the likelihood or feasibility of vessels operating in foreign waters returning to domestic competition. Without such a showing the only proper yardstick with which to measure competition is the number of boats which actually operate offshore the United States.

See, e. g., United States v. Crocker-Anglo Nat'l Bank, 277 F.Supp. 133 (N.D.Cal. 1967). It does seem highly unlikely that the government would be able to show that there is a reasonable probability of such potential competition becoming real in view of the fact, noted above, that boats on the West Coast do not compete with boats on the Gulf Coast due to the prohibitive expense of commuting back and forth which would appear even more prohibitive for boats operating in foreign waters. However, we need not further burden this already lengthy opinion by additional discussion of this point, other than to point it out, especially since it loses its otherwise important significance when we assume, infra, the facts as to market shares to be as favorable as possible to the government.

offered no evidence to support its allegations as to the breakdown of the national totals into the component Gulf Coast and West Coast areas which are the only relevant markets. While the list of the 429 firms contacted by the government yields the address of those companies, it does not indicate where the boats are operated, nor by our own calculation does the number of boats owned by firms with West Coast addresses correspond to the figures attributed to the West Coast in the government's allegations. The interview form does not indicate that this material was gathered in the interview. Likewise, the tabulations themselves fail to designate the total number of supply and utility boats chartered or available for charter in either of the relevant markets in 1967. Thus, there is a lack of evidence supporting the government's allegations as to the defendants' market shares of the Gulf Coast and the West Coast. The government's evidence reflects industry-wide data for only the entire nation which is not a relevant geographical market. The government, in fact, apparently realizes this because, while it argued the case as a *prima facie* violation of the statute primarily in reliance upon the alleged market shares, it concentrated on the alleged 31% of the national total and merely glossed over the alleged 50% of the West Coast market with only an occasional reference to the 22% share claimed in the Gulf of Mexico. Inasmuch as the government relied on the alleged market shares to establish a *prima facie* violation, it would be most illogical to virtually ignore the alleged West Coast market share unless that claim did, indeed, lack evidentiary support.

While we certainly do not in any way wish to criticize government counsel, whose motives are clearly above reproach, we are unable to accept as completely reliable the figures asserted by the government. Despite the diligent efforts of government counsel to conduct a thorough and unbiased survey, the very hurried nature of the investigation in haphazard fashion does in and of itself somewhat belie the reliability of the government survey. Cf. United States v. National Steel Corp., 251 F.Supp. 693 (S.D.Tex.1965). Our finding in this respect is strengthened by the fact that most of the government's statistical allegations were unsupported by any evidence whatsoever and the fact that only the scantiest evidence supported the other statistical allegations.[7] In an attempt to bolster the reliability of its figures, the government offered the affidavit of Commander John F. O'Connell, whose duties as a marine inspector in the Coast Guard in New Orleans occasioned him to make a survey of the offshore marine transportation industry. Our calculations indicate that he would conclude that there are about 227 supply and utility boats operating offshore in the New Orleans area.[8] However, we refuse

7. An additional reason causing us to suspect the reliability of the goverment's figures is the fact that, although, as noted above, we agree with the government's concept of the relevant product market as we there defined the boats constituting that market, which was largely based on the "Bright Lecture," it appears from the evidence herein that a borderline area exists between crew boats and utility boats in which it is difficult to distinguish one from the other. This indicates that there is a lack of universal agreement in the industry as to what constitutes a crew boat and what constitutes a utility boat. This area where the greatest difference of opinion exists apparently involves large high-powered boats with planing hulls. It is uncertain from the government's evidence whether the information obtained as a result of the telephone survey was based on the definition of supply and utility boats which the government advanced and which we adopted. It is imperative that the persons responding to the survey correctly understood what the government meant by its terms. Yet, it may well be that many of those persons contacted by the government stated that they owned "utility" boats which, by definition, were "crew" boats.

8. Pursuant to the information contained in O'Connell's affidavit, we took 7% of the figures in 2(a) and 2(c) of the exhibit attached to his affidavit and added to that figure the number indicated in 2(d) and

to attribute any probative value to the figures asserted by Commander O'Connell because the primary concern of his investigation was apparently to ascertain the number of marine casualties and, by his own admission, many of his figures were based solely on his guesswork, and for the further reason that his figures represent the number of boats inspected in New Orleans and operating in the New Orleans area only. At least five other Coast Guard stations on the Gulf Coast were required to make the same survey for their own respective areas, and the government has failed to produce the results of these surveys. Thus, O'Connell's survey would indicate, if anything, that there are substantially more supply and utility boats operating in the Gulf of Mexico than the government admits. Finally, the evidence offered by the defendants confirms our suspicions with regard to the market shares claimed by the government.

While the defendants critically attacked the intrinsic value of the government survey, their most poignant argument, amply supported by evidence, is that the government's figures inaccurately portray the universe, or total number, of supply and utility boats.

The defendants offered the results of a survey conducted by Frank John Deutschmann, Vice President of Tidewater, which was limited to boats actually operating off the Gulf Coast. Although Deutschmann was requested by Tidewater counsel to make the survey, he did not know what figures would aid Tidewater's counsel, and the procedures to be followed were left entirely to his choice. He rejected the method employed by the government because he felt through his experience in the industry that there were no reasonably accurate or complete lists of boat owners. He chose instead to conduct the survey based on the records required to be kept by the

Customs Houses in the Gulf Coast area. From these records he compiled a list of vessels which were documented in oil exploitation and geophysical operations, or known to be so engaged. Boats determined from other independent means not to be engaged in oil exploitation offshore the Gulf Coast were later deleted from this list; and the list was subsequently supplemented by a number of newly documented vessels as determined from an authoritative government publication. From this survey the defendants concluded that approximately 1,253 vessels were engaged in service to the offshore oil and gas industry in the Gulf of Mexico. Defendants seek to bolster the accuracy of their figures by reference to a recent report of the Department of Transportation concerning Continental Shelf Safety which indicated that about 1,500 vessels connected with the offshore oil industry were operating in the Gulf of Mexico. We are unable to ascribe any probative value to the Department of Transportation report, however, because the report failed to disclose what type of boats constituted the 1,500 total which may have included barges, tugboats and the like.

The 1,253 boats indicated by the defendants' survey included crew boats as well as supply and utility boats. However, Deutschmann testified that of the total 1,253, 493 were determined to be supply or utility boats. While the defendants failed to show the percentage of supply and utility boats owned by Tidewater and Twenty Grand, which may have been due to their misconception of the relevant market as including crew boats as well as supply and utility boats, they did offer evidence indicating that Tidewater and Twenty Grand owned a combined total of only 7.8% of the total 1,253 supply, utility and crew boats which they claim actually operate in the Gulf of Mexico.[9]

2(f). In making this calculation, we obviously excluded 2(e).

9. However, by no means does this give rise to an inference that Tidewater and Twenty Grand own only 7.8% of the

supply and utility boats actually chartered in the Gulf of Mexico. Nor have the defendants advanced this argument. In fact, by Tidewater's own admission, it alone has 48 supply and utility boats

In further support of its claim that the government used an improper universe, the defendants listed, over and above the 86 firms which the government claims compete with Tidewater and Twenty Grand, 90 persons or firms (Exhibit A) who are engaged in the chartering business and who have a total of 107 additional supply and utility boats available for charter off the Gulf Coast. This information was obtained by contacting some of the persons or firms on the government's list of 429 names which the government was unable to locate or contact, as well as some of those firms which the government stated did not own any supply or utility boats.[10]

In addition, the defendants' evidence revealed that there are a significantly larger number of supply and utility boats available for charter from the firms on the list of 429 which the government stated did have supply and utility boats.[11]

■ In summary, then, the only claims of each side respecting market shares which have any evidentiary sup-port at all are the government's claim that 396 supply and utility boats were available for charter in the United States during 1967 and that the combined total owned by Tidewater and Twenty Grand is 31% as well as the government's claim, weakly supported by only Exhibit 2C, that the supply and utility boats actually chartered for operation in United States coastal waters during 1967 numbered 340, of which Tidewater and Twenty Grand accounted for 87, or 25.6%, and the defendants' claim that there are a total of 1,253 supply, utility and crew boats actually operating off the Gulf Coast alone and that the combined ownership of these vessels by Tidewater and Twenty Grand is 7.8%, and that of the total 1,253 vessels, 493 are supply and utility boats. We simply have no way of resolving this factual dispute in light of the evidence which is unconvincing on either side, and can only state that the correct combined ownership by Tidewater and Twenty Grand of supply and utility vessels lies somewhere between 31% and 10% in both the United States as a

operating in the Gulf of Mexico, which is over 9.7% of the total 493 claimed by the defendants for the Gulf of Mexico.

10. The government's attempt to soften the damaging effect of this evidence failed. The government pointed out, through the testimony of Deutschmann, that defendants' Exhibit A contains the names of persons and firms who actually own the boats and that only about 10% of these owners are actually engaged in chartering the boats. The remainder of the owners do not charter their own boats but provide their boats to firms which do charter them. The government then declared that its Exhibit 2B is based on the number of boats a firm has available for charter rather than the number the firm actually owns because this more accurately reveals the true competitive situation. Thus, the government concluded, the additional 90 owners and 107 boats advanced by the defendants are irrelevant since these owners and boats are already encompassed in the government's tabulation (except for the 10% who do charter boats for themselves). However, the defendants proved that the government's tabulation failed to accurately reflect the number of boats which firms do have available for charter (see footnote 11 and accompanying text), and thus we can only conclude that the government's tabulation must have been based largely on ownership. This conclusion is fortified by an examination of the interview form and the confirmation letter used in the government survey, both of which refer to "ownership." Thus, the defendants' Exhibit A possesses considerable significance.

11. The defendants' evidence in this respect was produced by notarized affidavits of the owners or officers of some of the firms. The affidavits are not in conflict with the confirmation letters received by the government from these persons because the government's letters referred to "ownership" by the particular corporation, whereas the defendants focused on boats available to the particular corporation and thus included boats owned by subsidiary and affiliated corporations. However, even if they were contradictory, we would accept as true the information contained in the affidavits which, unlike the confirmation letters, was filed under oath. These affidavits clearly show that the government's exhibit 2B is misleading as to the true competitive situation.

whole, which is not a relevant market, and the Gulf Coast, which is a relevant market. We are completely in the dark as to the defendants' market share of the West Coast. However, in light of additional evidence introduced by the defendants, it is unnecessary for us to resolve this case solely on the basis that the government has failed to meet its burden of proof in establishing the defendants' market shares.

■ As noted above, the government's efforts in this case were directed solely to establishing the defendants' market shares. Relying mainly on *Philadelphia National Bank*, it claims that the combined market share of Tidewater and Twenty Grand and the elimination of competition between them constitute a *prima facie* violation of § 7. In that case the Court stated:

> "Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined *in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. * * ** The merger of appellees will result in a single bank's controlling at least 30% of the commercial banking business * * *. Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." (emphasis added) 374 U.S. at 363–364, 83 S.Ct. at 1742.

Even if we take the present case in the light most favorable to the government and were to *assume* that Tidewater and Twenty Grand together own 31% of the relevant market, we would be faced with the same market share as in *Philadelphia National Bank*, yet we would be unable to draw the conclusion the Court there did because the defendants herein have introduced, in the language of the Supreme Court, "evidence clearly showing that the merger is not likely to have [any] anticompetitive effects."

■ In measuring the anticompetitive effect of a merger, we must examine its effect on the competitors as well as the customers of the merged companies. United States v. Bethlehem Steel Corp., 168 F.Supp. 576 at 588, cited with approval in United States v. Philadelphia Nat'l Bank, 374 U.S. at 367, n. 43, 83 S.Ct. 1715. We examine first the defendants' competitors in the offshore marine transportation industry.

The offshore marine transportation industry is predominantly composed of small firms. Over one hundred, and possibly several hundred, small firms exist which have less than five supply and utility boats available for charter. In addition to this vast number of small competitors, a number of larger chartering firms engage in competition with Tidewater and Twenty Grand. Based on the government's Exhibit 2B, as supplemented by the defendants' Exhibit A and other evidence introduced by the defendants, we find that at least 14 firms, excluding Tidewater and Twenty Grand, have between at least 23 and 5 supply and utility boats available for charter. The market shares of these firms, based on the government's figures as to the national universe, ranges from over 1% to over 5%. In addition to the stiff competition from these chartering firms, large and small, Tidewater and Twenty Grand also face competition with drilling contractors and mud companies for the offshore transportation of supplies and equipment. Drilling contractors generally operate the offshore oil rig for the oil companies. Many drilling contractors have expanded into a total offshore service and now provide the craft, including supply and utility boats, needed to service these facilities. However, even though they operate the offshore oil rig, they still must bid for the charter contract against the offshore chartering firms such as Tidewater and Twenty Grand. These drilling contractors, who own a substantial number of supply and utility boats, have revenues ranging up

to 340 million dollars and are financially much larger than Tidewater and Twenty Grand who had revenues of 23 and 10 million dollars respectively last year. Also, a number of mud companies provide boats for the transportation of "mud" to the offshore drilling operations. They are thus competing with the chartering firms who attempt to acquire mud transportation contracts. Furthermore, the mud companies charter their supply boats, when they are idle, for transporting other supplies and material.

The competition among all these firms in securing charter contracts for the transportation of supplies and equipment is extremely vigorous. The offshore oil companies generally charter boats on a boat-by-boat basis. The bidding is open to all businesses with boats for hire. The charter contract, which varies in length from weeks to years, is simply awarded to the lowest bidder. When the oil companies endeavor to charter a boat, they are not concerned with how many boats a particular firm may have; nor are they impressed by a charterer's "name"; they are only interested in the best price and the best service. In fact, the oil companies appear to take deliberate steps to avoid a marriage with any one firm, preferring instead to spread their contracts among many firms. The evidence further indicates that the size of a company has no significant bearing on the price at which it is able to offer its boats. This is probably attributable to the fact that a significant portion of the costs involved would seem to be variable costs, plus the fact that the savings in financing costs which accrues to larger firms would appear to be offset by their heavier fixed costs in administrative expenses and the like.

Perhaps the most salient economic factor herein is the ease of entry into the offshore marine transportation industry. There are virtually no barriers whatsoever to entry. Financing is readily available, and anyone with a knowledge of boats or the oil industry, which knowledge abounds in this area, can enter the business with a capital investment as low as $5,000.00. Most firms which are now of considerable size started in just this fashion with only one boat. Tidewater, for example, commenced operations with a $30,000.00 investment in one boat in 1955 before financing in this industry was easily available, and has achieved its present size solely through internal growth. A further example of the ease of entry is the fact that many persons enter the business by acquiring a charter contract to commence several months in the future before they even have a boat. They are then able to finance the construction of a boat on the strength of the charter contract.

These factors, uncontested by the government, more than amply demonstrate that this merger will have no adverse effect on the defendants' competitors. In terms of sheer numbers, the small firms are overwhelming. At present they manage to breed, survive, and prosper. The older firms are growing and new ones are constantly entering the business, swelling the ranks of competition. If Tidewater, which now allegedly owns 76 supply and utility boats, has been unable to stem this rising tide of competition, we fail to see how the merged firm with a total of 123 boats could have a damaging effect. To the one-boat firm, a 123-boat firm could be no more oppressive than a 76-boat firm. The reason for this is evident from the unique nature of the market itself which places all competitors, from the very large to the very small, on an equal basis, suffering no handicap. There are no underdogs. It is clear that the competitive climate is extremely healthy.

■ Our conclusion in this respect is further substantiated by a number of affidavits from small firms which definitively state that the merger will have no adverse effect on their business or ability to compete.[12] This sentiment is very

12. These affidavits are distinguishable from the competitors' testimony in Phila-

delphia Nat'l Bank, 374 U.S. at 366, 367, n. 43, 83 S.Ct. 1715, which was largely

impressive, prevailing as it does among the small competitors who have the most interest at stake in preventing the merger. It becomes even more impressive in view of the fact that one of the questions on the interview form used for the survey conducted by the government was whether the merger would affect the business of the firm interviewed; yet the government was unable to introduce even one statement from a competitor indicating that the merger would have an adverse effect on his business.[13] In fact, a number of small competitors stated that the small firm has a competitive advantage in this business in that they are able to give their customers more personalized service. Thus, it is clear from the very nature of this market with its rugged, individualistic competitors that the merger of Tidewater and Twenty Grand will not adversely affect the defendants' competitors, large or small.

Likewise, an examination of the defendants' customers reveals that there will be no adverse effect upon them. The customers of the offshore marine transportation industry mainly consist of the huge oil companies such as Standard Oil of New Jersey, Shell Oil Company, Texaco, Gulf Oil Corporation, Mobil Oil Corporation, Continental Oil Company, Sinclair Oil Corporation, Tenneco, etc. These corporate giants, with their vast financial empires, number among the largest corporations in the United States; many rank among the biggest in the world. Their annual sales are measured in the billions of dollars. Even the "small" oil companies far outstrip Tidewater and Twenty Grand in size. Each offshore rig requires an investment by an oil company of millions of dollars, and daily operating expenses total several thousand dollars. Thus, another startling fact in this case is that the "seller" here is virtually microscopic compared to the "buyer." The simple truth is that the oil companies wield all the economic power in the offshore world. Regardless of how big Tidewater and Twenty Grand may forseeably become, they must remain subservient to the wishes of their customers. In fact, the oil companies are quite capable of operating their own supply and utility boats. When offshore exploration for oil originated in the late 1940's, the oil companies supplied all the service craft. However, as the offshore marine transportation industry developed in the 1950's, they preferred to charter rather than invest in the boats, thus freeing more capital for the more lucrative investment in oil operations. But they continue to acquire and operate a number of their own supply and utility boats and have indicated that they would supply all of their own boats if they became dissatisfied with either the price or the service of the boats they charter. Clearly then, the combination of Tidewater and Twenty Grand will not enable the merged firm to act detrimentally to the welfare of their customers.[14]

discarded by the Supreme Court. The testimony in that case concerned the competitors' opinions as to the vigor of future competition after the merger. The affidavits here, however, are directed to the effect of the merger on the affiants' own businesses. Here, unlike *Philadelphia Nat'l Bank*, the competitors are speaking on that which they are most qualified to speak. Further, also unlike *Philadelphia Nat'l Bank*, the competitors here gave concrete reasons to support their statements.

13. The government apparently sensed the futility of such questioning for it candidly admitted on page 4, footnote 1, of the Sheppard affidavit that it quit asking this question as the survey progressed.

14. If we assume, *arguendo*, that Tidewater and Twenty Grand did not have to fear being supplanted by their numerous competitors and could engage in oppressive practices forcing the oil companies to construct their own boats rather than charter, then it may be that this fact, that is, forcing the customers to invest in boats when it is more profitable for them to charter, would be a serious anticompetitive effect. Such a suggestion, however, answers itself for the defendants' own economic interest will prevent them from doing that which would destroy their own business.

The government appears to recognize these salient economic factors for, in the last analysis, it simply contends that there are certain economies of size and that these economies should be enjoyed by more than just one firm. We have already pointed out, however, that there are a number of other sizeable firms in this industry. These firms enjoy and will continue to enjoy the economies·which accrue to larger business concerns. In fact, the drilling contractors in competition with the defendants are several times the size of the defendants, and thus in a better position to effect economies of size than Tidewater and Twenty Grand. The only specific economies of scale relied upon by the government are better financing arrangements and research and development projects.[15] As far as cheaper financing is concerned, the government's basic premise is correct—a large, established, financially sound firm can obtain financing at a lower cost. As we have already noted, however, this advantage would appear to be offset by their larger administrative expenses. Further, this advantage is already enjoyed, not only by Tidewater and Twenty Grand, but by a number of other larger firms as well, and we fail to see how a further increase in size will further increase the financing benefits already experienced by the defendants. The merger with respect to offering additional research and development possibilities appears beneficial rather than detrimental in that it would inure to the benefit of the industry as a whole. Additionally, the drilling contractors have a far greater financial capacity for engaging in research and development than the defendants. Thus, when stripped to the bone, the twin underpinnings of the government's contention as to the economies of size fail to sustain its position. But even more basically, we do not feel that economies of size alone can be any basis for invoking the antitrust laws. Quite the contrary, for the business quest for economy and efficiency is a mainstay of competition. It is when this quest is eliminated and stagnation sets in that competition suffers. Economies of size, ·acquired through a merger, will justify the application of the antitrust laws only when it offers the merged firm significant competitive advantages so that a probability of a substantial lessening of competition ensues. To hold otherwise would espouse a warped view of the fundamental policy of antitrust law; mergers should not be condemned because they are beneficial to the merging parties, but because they are harmful to customers and competitors, or to competition as a whole. In this case, even if the merger were to afford economies of size to the defendants to the exclusion of other firms, the anticompetitive result is clearly absent.

Bigness alone is not the evil. The Clayton Act's purpose is to thwart mergers which tend to stifle competition. For these reasons market shares, while undeniably important, do not tell the whole story. The law is geared to economics, not mathematics. The core ques-

---

15. Parenthetically, we might note that advertising, which flourishes with size, is not a "major competitive weapon" in this industry as it was in Federal Trade Comm'n v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). We should also note, though, that a few government affidavits obtained from competitors of Tidewater and Twenty Grand stated that size does benefit a chartering firm in one respect in that it enables the large firm to replace a vessel which becomes disabled with another one. However, we do not know how often boats break down on the job and are unable to assess the significance, if any, of this factor. Further, it would not seem feasible to take a boat off of one job to replace a disabled boat on another job, nor would it appear profitable to maintain an idle fleet of boats in order to replace those which do break down. Finally, this factor, if true, appears without significance from the fact that the larger firms are already endowed with this "advantage," yet it has not dampened the flourishing competition from the small firms. Since this factor has not noticeably influenced the customers' choice in this market, the "advantage" it affords, if any, lacks any anticompetitive effect.

tion of the merger's probable effect on competition must be examined in light of all the pertinent economic factors of the particular market. United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); Brown Shoe Co. v. United States, 370 U.S. 294, 322, n. 38, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The examination of the economic structure of the market involved here completely demolishes any presumption of a *prima facie* violation of § 7 which may arise from the defendants' market share which we assumed to be 31% merely for the purposes of this opinion. From that examination of the defendants' competitors and customers, it is clear that the merger of Tidewater and Twenty Grand will not adversely affect either group. Nor have we been able to discern any public interest differing from the interests of these two groups which would be adversely affected. Due to the nature of the market, the merged firm will lack the oligopolistic power to set the pricing policy for the industry or engage in other anticompetitive practices. The government's argument that the merger will prevent pressure for lower prices, higher quality service, and innovations to improve efficiency is without merit. The oil companies award the charter contract on the basis of price and service. They certainly have the economic wherewithal to maintain the pressure for lower prices and better service. Nor is it as if they stood this vigil unaided, for an untold number of individualistic competitors, unimpressed by the defendants' size, stand by ready to pick up the defendants' contracts should they step out of line. The ease with which a boat may be financed and the speed with which it may be constructed insures this probability. These facts also serve to illustrate the lack of merit to the contention that the merger will block innovations to improve efficiency. In short, we are convinced, from the evidence before us, that the merger of Tidewater and Twenty Grand will not substantially lessen present competition in the furnishing of supply and utility boats. It would, of course, be utterly foolish to contend that the merger would tend to create a monopoly.

■ Our conclusion is the same when we turn, as we must, to its probable effect on future competition. There is absolutely nothing to indicate a contrary result. All the evidence as to the future is prophetic of significant increases in offshore oil exploration and production, which is beckoning even greater numbers of entrants into the marine transportation industry. The construction of new service craft is continuing at a furious pace. In fact, Tidewater's share of the total number of service craft has recently declined slightly, indicating that the industry as a whole is expanding faster than Tidewater. This has probably been the trend ever since the initiation of the industry as Tidewater appears to have been the pioneer firm in the industry. In view of these facts, we are simply unable to foresee any probability that future competition will be substantially lessened.

■■ The reason for the merger certainly does not detract from our conclusion in any way. The avowed purpose of this merger is to enable Tidewater to crack the international towing market. Tidewater has no ocean-going tugboats. It does, however, have considerable experience with foreign countries in furnishing service craft for oil rigs located in foreign waters. Twenty Grand, on the other hand, has large tugboats capable of ocean towing. It, however, lacks Tidewater's significant international experience. Thus, the defendants feel that the combination of Tidewater's international experience with Twenty Grand's ocean towing capacity will enable them to overcome the existing barriers to entry into the apparently burgeoning business of ocean towing of rigs—a market which is completely dominated by foreign firms with no real American competition. We realize, of course, that the mere existence of a valid business purpose for the merger, with possible limited exceptions inapplicable here, will not rescue the

merger from the Clayton Act if it has a probable anticompetitive effect. United States v. Pennzoil Co., 252 F.Supp. 962 (W.D.Pa.1965); United States v. Ingersoll-Rand Co., 218 F.Supp. 530 (W.D.Pa. 1963), aff'd, 320 F.2d 509 (3rd Cir.). However, we do feel that where, as here, we find no anticompetitive effects, then the existence of a valid business purpose for the merger allays the inherent suspicion cast upon mergers by the Clayton Act.

■■■ One final consideration remains. The government has contended that the mere elimination of competition between Tidewater and Twenty Grand will substantially lessen competition in the relevant market. We do not agree. A horizontal merger such as this is not *per se* a violation of § 7. Lunkenheimer Co. v. Condec Corp., 268 F.Supp. 667 (S.D.N.Y.1967). If it were, no such merger would be allowed. In *Brown Shoe* the Court stated:

"Where the arrangement effects a horizontal merger between companies occupying the same product and geographic market, whatever competition previously may have existed in that market between the parties to the merger is eliminated. Section 7 of the Clayton Act, prior to its amendment, focused upon this aspect of horizontal combinations by proscribing acquisitions which might result in a lessening of competition between the acquiring and the acquired companies. *The 1950 amendments made plain Congress' intent that the validity of such combinations was to be gauged on a broader scale: their effect on competition generally in an economically significant market.*" (emphasis added) 370 U.S. at 335, 82 S.Ct. at 1529.

Consequently, in determining whether the elimination of competition between the merged firms violates § 7, we do not operate in a vacuum. We must determine whether it will substantially lessen competition in the relevant market. We are guided in this determination by our examination of the pertinent economic factors of that market.[16] From our ex-

16. One court, however, apparently takes a different view. United States v. Manufacturers Hanover Trust Co., 240 F. Supp. 867, 955 (S.D.N.Y.1965). Relying on United States v. First Nat'l Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), the court there held that the elimination of substantial competition between the merged banks did in and of itself, and without regard to the pertinent economic factors of the relevant market, constitute a violation of § 7 of the Clayton Act. We do not agree with that view. The *Lexington* case involved the Sherman Act, and we are unwilling to extend that holding to the Clayton Act, especially when four of the justices in that case refused to ascribe to the majority holding. In addition, the *Lexington* case, as with all antitrust cases, turned on its own particular facts. See Winn Ave. Warehouse, Inc. v. Winchester Tobacco Ware. Co., 341 F.2d 287 (6th Cir. 1965). In that case it was clear from the *market structure* that the consolidation would seriously impede the ability of the remaining banks to compete. We feel justified in our opinion in view of the number or decisions applying § 7 of the Clayton Act subsequent to the *Lexington* case in none of which did the Supreme Court even mention the *Lexington* case. These decisions, the benefit of many of which was únavailable to the court in *Manufacturers Hanover*, leave undisturbed the principle quoted in *Brown Shoe*, supra, and, in fact, reaffirm that decision. Those decisions are: Federal Trade Comm'n v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. First City Nat'l Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967) (this case did cite the *Lexington* case at 367, 87 S.Ct. 1088 but for a totally unrelated principle); United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); United States v. Von's Grocery, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); Federal Trade Comm'n v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775

amination above, it is clear that this market lacks the characteristics of those markets in which the elimination of competition between the merged firms has been found to be fatal. There is no history of prior mergers in this market or by these defendants. This is not an oligopolistic market in which a few firms set the industry standards in pricing and other practices. It is not an overly concentrated market. It does not appear probable that this merger will lead to other mergers, resulting in an unduly concentrated market. The reason for this is due to the esoteric purpose for this merger and the fact that size offers no significant advantages in the marine transportation industry. In light of these factors, the mere elimination of competition between Tidewater and Twenty Grand does not violate § 7. The market structure prohibits a contrary conclusion.

In summary, then, the government simply did not establish a basis for the issuance of a preliminary injunction. The government failed to carry its burden regarding the defendants' market shares, due to defects in the government's own proof as well as the rebuttal evidence introduced by the defendants. Further, if we assume the market shares to be as the government contends, the uncontroverted evidence produced by the defendants as to the economic factors of this market convinces us that even if the defendants do control 31% of a relevant market, there is no probability that the merger will substantially lessen competition. For these reasons, the government failed to show a reasonable probability of success upon the merits, and we therefore denied the motion for a preliminary injunction.

(1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed. 2d 953 (1964); United States v. Alumi-

num Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).